UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------ x

SCOTT CHERNOFF,

<table>
<tr><td></td><td>Plaintiff,</td></tr>
</table>

-against-

THE CITY OF NEW YORK; NEW YORK CITY POLICE
PENSION FUND (NYCPPF); MICHAEL D. WELSOME,
Director, New York City Police Pension Fund;
RAYMOND W. KELLY, Police Commissioner; JULIUS
MENDEL, M.D., Medical Board, New York City Police
Pension Fund; RICHARD GASALBERTI, M.D., Medical
Board, New York City Police Pension Fund; ARSEN
PANKOVICH, M.D., Medical Board, New York City
Police Pension Fund; JULIE L. SCHWARTZ, Assistant
Commissioner, Department Advocate's Office;
KATHLEEN M. KEARNS, Managing Attorney,
Department Advocate's Office; LOUIS W. LUCIANI,
Deputy Inspector, Department Advocate's Office; PRINCI,
Lieutenant, Department Advocate's Office; CIASIO,
Sergeant, Department Advocate's Office; JOHN DOE 1,
Police Officer, Department Advocate's Office; JOHN DOE
2, Police Officer, Department Advocate's Office; JOHN
DOE 3, Police Officer, Department Advocate's Office;
JOHN DOE 4, Police Officer, Department Advocate's
Office, each being sued individually and in their official
capacities as employees of the NYPD and/or the NYCPPF

Defendants.

------------------------------------------------------------------------ x

**REPLY DECLARATION OF
LAWRENCE J. PROFETA IN
FURTHER SUPPORT OF
DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT**

06 CV 2897 (CPS)(CLP)

 

 

**LAWRENCE J. PROFETA** declares, pursuant to 28 U.S.C. § 1746, under penalty of

perjury, that the following is true and correct:

       1.     I am an attorney licensed to practice law in the State of New York. I am a

Senior Counsel in the office of Michael A. Cardozo, Corporation Counsel of the City of New

York, attorney for defendants herein. As such, I am fully familiar with the facts and

circumstances of this action. I respectfully submit this reply declaration in further support of defendants' Motion for Summary Judgment. Submitted herewith are true and correct copies of the following:

2. Exhibit 1 is a "Notice" signed on 3/12/04.

3. Exhibit 2 is pages from the October 23, 2007 Deposition of Scott Chernoff.

Dated: New York, New York
April 2, 2008

Lawrence J. Profeta (LP 5674)
Assistant Corporation Counsel
Lprofeta@law.nyc.gov

**Exhibit 1**



POLICE DEPARTMENT
CITY OF NEW YORK

NOTICE

1. In accordance with Section 13-251 (and/or Section 13-252) of the Administrative Code of the City of New York, the Police Commissioner has recommended that the Police Pension Fund Article 2 Medical Board examine you to determine if you should be retired on an Accident or Ordinary Disability Retirement.

2. If the Article 2 Medical Board determines that you are disabled from the performance of full police duties, and the Police Pension Fund Board of Trustees concurs, you will be retired on a Disability Retirement.

3. If the Police Commissioner's application is for Ordinary Disability Retirement and you believe your disability was the natural and proximate result of a line of duty accident, you may apply for, and be considered for, an Accident Disability Retirement.

4. If you believe that you are not disabled and can perform full police duties, and you do not wish to be retired, you have the right to the following procedures:

A. You may request copies of all documents in your departmental file that will be considered by the Article 2 Medical Board in reviewing your case subject to redaction.

B. You have sixty (60) days from the date of this notice to provide any additional medical or other evidence to the Article 2 Medical Board that you reasonably believe to be relevant.

C. You will be examined by the three-physician Article 2 Medical Board. Prior to that examination, you will be entitled at your expense to have any treating or consulting medical professional appear before the Article 2 Medical Board and be heard on your behalf.

D. If the Article 2 Medical Board recommends that you be retired, you have the right to ask the Police Pension Fund Board of Trustees to remand the case a maximum of two (2) times to the Article 2 Medical Board to address errors you believe were made and/or to consider new evidence. No personal appearances by doctors will be permitted on remand except when requested by the Medical Board. Additional remands will be allowed only upon vote of the Board of Trustees. No personal appearances will be permitted before the Board of Trustees, but you or your attorneys may present written arguments and/or new evidence to the Board of Trustees in support of a request for a remand to the Article 2 Medical Board.

5. I, _P.O. Scott Chelnoff_
Rank        Name (Printed)

acknowledge receipt of this notice on _03/12/04_
                                        Date

D 00885

**Exhibit 2**

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
2    --------------------------------------------X
     SCOTT CHERNOFF,
3
                                    PLAINTIFF,
4
                                    CV 06 2897
5                                   (CPS)(CLP)

6                     -against-

7    THE CITY OF NEW YORK; NEW YORK CITY POLICE
     PENSION FUND (NYCPPF); MICHAEL D. WELSOME,
8    Director, New York City Police Pension
     Fund; RAYMOND W. KELLY, Police Commissioner;
9    JULIUS MENDEL, M.D., Medical Board, New York
     City Police Pension Fund; RICHARD GASALBERTI,
10   M.D., Medical Board, New York City Police
     Pension Fund; ARSEN PANKOVICH, M.D., Medical
11   Board, New York City Police Pension Fund,
     JULIE L. SCHWARTZ, Assistant Commissioner,
12   Department Advocate's Office; KATHLEEN M.
     KEARNS, Managing Attorney, Department
13   Advocate's Office; LOUIS W. LUCIANNI, Deputy
     Inspector, Department Advocate's Office;
14   PRINCI, Lieutenant, Deputy Inspector,
     Department Advocate's Office; CIASIO,
15   Sergeant, Department Advocate's Office;
     JOHN DOE 1, Police Officer, Department
16   Advocate's Office; JOHN DOE 2, Police Officer,
     Department Advocate's Office; JOHN DOE 3,
17   Police Officer, Department Advocate's Office
     and JOHN DOE 4, Police Officer, Department
18   Advocate's Office, each being sued
     individually and in their official capacities
19   as employees of the NYPD and/or the NYCPPF,

20                                  DEFENDANTS.
     --------------------------------------------X
21

22             DATE:  October 23, 2007

23             TIME:  10:20 a.m.

24

25

1              He never sees this report, by the way.  So --

2              MR. PROFETA:  Well -- okay.

3              In any event, I'm taking his testimony.  I'm

4              just trying to see if there's anything in here

5              that's inconsistent with his memory.  That's all

6              I'm doing.

7              MR. SANDERS:  No, I understand.

8              Just to let you know, he doesn't see that

9              report.  That's filled out by a person in payroll.

10             MR. PROFETA:  I asked him if he's seen it

11             before.

12             MR. SANDERS:  He said he assumed.

13        Q.   This isn't your handwriting, right?

14        A.   No.

15        Q.   Okay.  Is there anything on the first page that

16   looks like it's wrong?  Does anything jump out at you as being

17   wrong?

18        A.   Wrong?

19        Q.   Yeah.  Something inaccurate.

20        A.   Well, if you're going to mention 9-11, there's

21   nothing there for 9-11.

22        Q.   It looks like you worked 9-11?

23        A.   Yeah, I did work 9-11.

24        Q.   It says you worked on 9-11, 9-12, and 9-13, right?

25        A.   Um-hmm.

1    Q.   And then you took, you took off 9-14 and 9-15

2  because those were your days off, right?

3    A.   Yes.

4    Q.   And you didn't work those days?

5    A.   Not that I can recall.

6    Q.   Okay.  And on 9-12, September 12th, 2001, where did

7  you work?

8    A.   At the identification center.

9    Q.   Physically you were in the identification center?

10   A.   You still had to report.  Even though the attack

11  happened, yeah.

12   Q.   And did you come to work that day?

13   A.   Oh, yes, I did.

14   Q.   So on 9-11, you took a later train and you arrived

15  in Manhattan around 8:30; is that what you said?

16   A.   Yes.

17   Q.   Were you --

18   A.   I was in lower Manhattan, by, I would say

19  approximately between 8:30 and 8:45.  It was before the first

20  plane.

21   Q.   Okay.  So then you were walking down Chambers

22  Street to --

23   A.   No, I had just gotten my breakfast at the corner of

24  Chambers and Church, had just paid for it, and I stepped out

25  and that's when the first plane flew over my head and I watched

1      it crash into the first tower (indicating).

2          Q.      Okay.  And what did you do when you saw that

3      happen?

4          A.      I went into shock.  Disbelief.

5          Q.      Okay.

6          A.      Couldn't believe what I had seen.

7          Q.      And so did you remain standing there?

8          A.      Yes.  Yes, I did.  Yes.

9          Q.      Do you want to take a break for a minute?

10          A.      No, I want to get through this.  I want to get

11      through this.

12          Q.      Okay.  So then did you continue on your way to

13      work?

14          A.      I, I remember watching the fire ball (indicating),

15      I remember, you know, seeing the plane fly over my head, crash

16      into the tower (indicating), explode, I don't know how many

17      seconds I was there, watching it, I was there just staring at

18      it in disbelief, pretty much, it could have been -- I don't

19      know how many seconds, and then I remember looking into the

20      deli and telling the people behind the counter, call 911, a

21      plane has just crashed into the tower.

22          Q.      Right?

23          A.      And they looked at me in disbelief, and then I went

24      back to looking at it again (indicating), and, um, around that

25      time it -- the idea came to my mind that we're going to get

1   mobilized for this. We got -- I better get myself back to
2   police headquarters. And -- so I did. I went down Chambers
3   Street to police headquarters, and I remember calling my, my
4   wife and I told her to turn on the news, you know, the -- a
5   plane has just crashed into the Trade Center, you and she
6   turned it on, and she watched and she told me to be careful,
7   and I said I, I will, and I love you. That was the last time I
8   spoke to her. Made my way to police headquarters.

9       Q.   Okay.

10      A.   And made my way up to the sixth floor, and there
11  was chaos. People were hugging, and crying, and -- it was --
12  fainting. Whatever. And there were a whole bunch of cops and
13  other employees against the window, we had a view of the Trade
14  Center (indicating). And you could see it burning
15  (indicating). The tower.

16      Q.   The first tower?

17      A.   The first tower.

18      Q.   Uh-huh.

19      A.   And I remember signing in, and I believe I put
20  0737. I did. I, I was basically in shock. You know. I
21  couldn't tell you why I did that, or --

22      Q.   Right.

23      A.   I guess because of the urgency. You know. I knew
24  we were going to be mobilized for something. I really can't
25  recall why. I remember I recall signing in.

1    Q.    Where did you sign in?

2    A.    What?

3    Q.    Where did you sign in physically?

4    A.    There was a roll call sheet (indicating) on the

5    desk, and Mary was there.  You know.  But she was, she was just

6    in shock.

7    Q.    So this was a roll call sheet for the ID section?

8    A.    Yes.

9    Q.    Okay.  So you saw the first plane hit, you stood in

10   shock, and then you walked down Chambers Street to One Police

11   Plaza?

12   A.    Yeah.  Walked?  No.  I ran.

13   Q.    You ran?

14   A.    Yeah.

15   Q.    And so this was what time?  Around 9:00 or so?

16   A.    Whenever the first plane flew over.  Yes.  Around

17   9-ish.

18   Q.    Okay.  So then you were in the ID section, and then

19   what happened?

20   A.    Well, there was a whole bunch of cops, and some

21   civilians standing by the window, looking at the tower burning,

22   and I walked over there, and I was telling them what I had

23   seen, and we were there, staring at the tower burning, and

24   somebody said, what the hell is that, and we looked and we see

25   the second plane coming (indicating).  And it crashed into the

CHERNOFF

1    Q.    You did catch a train, Long Island Rail Road train?

2    A.    Yeah.

3    Q.    And you got home like sometime --

4    A.    I maybe had three hours of sleep. Maybe. The

5 most. Three hours, four hours.

6    Q.    Did you have trouble sleeping?

7    A.    I know that it was quick. I didn't sleep that

8 much.

9        And then I had to report the next day.

10    Q.    Did you have trouble sleeping, or you slept?

11    A.    Well, I mean I remember going home, and my wife

12 hugging me, and I told her, you know, I gave her a quick

13 synopsis of what happened, and I had to get some sleep, so I

14 went to bed.

15    Q.    And you slept?

16    A.    And I slept.

17        And then I had to drive in the next day,

18 because --

19    Q.    Did you ever get dinner?

20    A.    Dinner? No.

21    Q.    What about lunch?

22    A.    Nothing.

23    Q.    You never ate anything?

24    A.    No.

25    Q.    All right. So you slept and you woke up at what

1    time?

2         A.    I had to report back to work at 0737.

3         Q.    Your regular shift?

4         A.    Yeah.

5         Q.    So what did you do the next day?

6         A.    Well, the unit was pretty much -- it was not

7    working.  At all.

8         Q.    You took the train in?

9         A.    No.  I drove.  I had to drive in.  So I had to, I

10   had to go over the Brooklyn Bridge, you know, and --

11        Q.    Okay.  So you reported to the -- your regular --

12   you know?

13        A.    Yeah.  I had to report to my assignment.

14              But there was nothing going on.  I mean it was

15   basically, you know, you know, you were pretty much sent out to

16   volunteer, like, wherever they needed help in the building.

17   They were bringing in food, and supplies, and -- they were

18   holding a lot of like, like luncheons and stuff for outside

19   police officers.  You, you had a lot of down -- I mean there

20   was just a lot of free time, so we, we had walked by the site,

21   we went by to see the site, um, just, you know, walking around

22   the whole area.  Just the whole area was a ghost town.  You

23   know?

24        Q.    Yes.

25              So you were pretty much assigned to help out

1    anywhere in One Police Plaza?

2        A.    Yeah.

3              I remember one time I sat with Walter Reevers'

4    family.  Because the families were waiting for some kind of

5    response.

6        Q.    This is at One Police Plaza?

7        A.    Yes.

8              But you would walk outside too.

9        Q.    But you were free to do whatever you wanted?  Is

10   that what you're saying?

11       A.    Pretty much.  Just as long as you came back.  I

12   mean there was really no set assignment.  There was nothing

13   going on.  Our unit was dysfunctional.  It was non-functioning.

14       Q.    So what hours did you work on September 12th?

15       A.    I worked the day tour.

16       Q.    So you just worked your regular shift?

17       A.    I believe so, yeah.  We were still working regular

18   shifts, yeah.

19       Q.    And did you receive any assignment to do anything

20   at the site itself, or you were just --

21       A.    No.  They didn't -- my lieutenant, my YO didn't

22   want us near that.  He didn't want us working on that pile,

23   or --

24       Q.    Who was your CO?

25       A.    Lieutenant Monaghan.  James Monaghan.

CHERNOFF

1    Q.    So to the extent you were assigned to do anything,

2    it was just to help out in One Police Plaza?

3    A.    Yeah.  Just keep yourself out of trouble.  Help out

4    where you can.  You know.  I mean everybody was still in shock

5    and disbelief.

6    Q.    So to the extent that you walked outside, it was

7    your decision to walk out and check things out?

8    A.    Well, I mean, wouldn't you?  It's a disaster site?

9    We had definitely wanted to see how big of a disaster it was,

10   and how much damage it caused.  So, yeah, cops were going by

11   there, you know, and just looking at the devastation.

12   Q.    And did you get breakfast when you came on

13   September 12th?

14   A.    There was no breakfast going on anywhere.  Other

15   than the food that they had brought into the building.  There

16   was no stores open.  Everything was closed.  Everything was

17   shut down.

18   Q.    Where did you park your car?

19   A.    Where did I park my car?

20   Q.    Yeah.

21   A.    I believe I parked on Avenue of the Finest.  You

22   know.  You had parking along there.

23   Q.    Okay.  And then you drove home at 4:00?

24   A.    Yeah.

25   Q.    And you just got onto the expressway and drove

1    home?

2        A.    Yes.

3        Q.    And you had dinner when you got home?

4        A.    Yes.

5        Q.    And then you went to sleep, and had a regular shift

6    the next day too?

7        A.    Yes.

8        Q.    So when you came in on the 13th, what did you do?

9        A.    (No verbal response.)

10       Q.    Same type of thing.

11       A.    The 13th?

12       Q.    Yes.

13       A.    Yeah, I mean if it was a day that I worked, yes.

14       Q.    And the same type of thing, though?

15       A.    Same type of thing.

16       Q.    You were just assigned to help out at One Police

17    Plaza?

18       A.    Just nothing -- that -- everything was

19    dysfunctional for weeks.  I mean no civilian employees were

20    coming in.  They refused to come in.  So it was just the cops,

21    and you had outside police pouring in, you know, and we

22    would -- you know.  They would accommodate them at police

23    headquarters, and you had food there, you had supplies.  I mean

24    I was constantly being asked, can you help me with this, can

25    you help me with this.

1    Q.    Administrative stuff in the building?

2    A.    Moving stuff around.  Boxes, storage.  I mean I

3    remember helping, you know, one guy, I think he was the

4    commissioner or something, he was having me, he was always

5    volunteering us to help out and stuff.  You know.

6    Q.    All right.  So if you look on -- so you had off on

7    the 14th and 15th of September, and then on the 16th you

8    reported back your regular shift?

9    A.    Yes.

10    Q.    And you worked at One Police Plaza that week also?

11    A.    Yes.

12    Q.    And were you ever assigned to work at the site?

13    A.    I wasn't started -- we didn't start assigning, you

14    know, getting assignments to work at the site until December.

15    Q.    So from September until December, you worked at One

16    Police Plaza?

17    A.    Yes.

18    Q.    Doing administrative-type things?

19    A.    Yes.

20    Q.    And did you drive each of those days, or did you

21    take the train?

22    A.    I drove.

23    Q.    Okay.

24    A.    The trains weren't working for a long time.

25    Q.    I see that you were out sick on October 1st and

1    2nd?

2         A.    (No verbal response.)

3         Q.    Do you recall what you were out sick for?

4         A.    No.

5         Q.    And did you have your regular days?  You would work

6    your regular shift, and then go home and have dinner?

7         A.    Yes.

8         Q.    And then you would go to sleep, and then wake up,

9    and come in the next day?

10        A.    Well, I mean I started, you know, having

11   recurrences.  You know.  I -- if I was to pinpoint the times I

12   started having nightmares and stuff, it was, it was around

13   October or November, December.  But I wasn't really complaining

14   about it.  I wasn't saying much about it.  You know.  My ex

15   knew that I would wake up and stuff, which I wouldn't say

16   anything about it.  I started having, having trouble sleeping.

17        Q.    When did you start having trouble sleeping?

18        A.    I would say around that time.  Around --

19   between -- around October, November, December.  That's when

20   it -- PTSD, if I can recall, really started happening.  You

21   know.  I had trouble sleeping.

22        Q.    And what happened?  You said you got nightmares?

23        A.    I would have nightmares, yeah.

24        Q.    What kind of nightmares?

25        A.    Well, one recurring that I still have is the first

1    plane that I, that I witnessed slamming into the first tower.

2         Q.    So you would have a recurring image of it?

3         A.    Yes.

4         Q.    And anything else?

5         A.    Building falling.  Of the second building falling

6    first.

7         Q.    And you were in One Police Plaza when the first

8    building came down?  The first time the building came down?

9         A.    No.

10        Q.    Where were you?

11        A.    I was on, I was on Church Street.

12        Q.    Oh, that's right.  I'm sorry.

13             And but the second one, you were in the

14   vicinity of Pearl and --

15        A.    Yeah.  Pearl and --

16        Q.    And One Police Plaza?

17        A.    Uh-huh.

18        Q.    Did you take any kind of sleeping pills --

19        A.    No.

20        Q.    -- or any kind of medication?

21        A.    No.

22             I was a health -- I was into health, I was

23   into exercise.  So, you know, I just thought if I maintained

24   my, you know, exercise regiment and still, you know -- that

25   everything would be fine.  You know.  That way.  You know.  I

1  always tried to maintain a healthy outlook.  You know.  Always

2  thought that would work.

3      Q.    So you say it wasn't until December that you were

4  assigned to -- outside of One Police Plaza?

5      A.    Yeah.

6      Q.    What were you assigned to do?

7      A.    Well, that's when they started, you know, asking

8  for volunteers to work at the site.  To work at Ground Zero.

9      Q.    Uh-huh?

10     A.    And I would, I would volunteer.

11     Q.    And this would be during your regular shifts?

12     A.    Yes.  There would be like -- yeah.  It would be

13  straight time.  Shifts.  You know.  You would get just a little

14  overtime on the back end.  You know.  It wasn't a lot of

15  overtime.

16     Q.    And what did you do?

17     A.    (No verbal response.)

18     Q.    When you said that you --

19     A.    You were security for the site.  You were security

20  for Ground Zero.

21     Q.    So you would stand around the perimeter?

22     A.    Yeah.

23     Q.    And you would just sort of guard it?

24     A.    You would guard it.

25     Q.    Did you do anything other than that?

1    A.    Well, you still had the responsibilities of a

2    police officer.  So if any crimes were being committed, you had

3    to make arrests.

4    Q.    If you were present?

5    A.    Oh, yeah.

6          I made an arrest.

7    Q.    You made an arrest?

8    A.    Yes.

9    Q.    How many arrests did you make?

10   A.    I made one arrest.

11         I had to arrest a construction worker.

12   Q.    And what happened?

13   A.    He -- you had to wear ID.  You had to wear

14   security ID at all times to enter and exit the premises, and

15   they had Bovis and all those other construction companies where

16   they had their own security there --

17   Q.    Right?

18   A.    -- and -- but you were still there.  They had

19   construction workers, as a security guy, and then you were

20   there, and I recall one day this one construction guy refused

21   to have his ID on him (indicating), and they questioned him,

22   and they were like, hey, you know, you got to have it on, you

23   what's wrong with you.  And then he started arguing, and he

24   pushed him (indicating), and the guy called me over, he said,

25   officer, I need your help.  And I walked over, and he said this

1  guy doesn't want to wear his ID. And I said how come you don't

2  want to wear your ID. And he pushes me.

3  Q.  So what happened?

4  A.  So I locked him up.

5  Q.  And you arrested him?

6  A.  And I arrested him.

7      And he resisted.

8  Q.  Did you get injured?

9  A.  Yeah. I got a scratch on -- I forget which arm it

10  was. I think it was my right arm (indicating). I cut my

11  elbow. Because we ended up tussling with each other inside the

12  security perimeter and ended up going outside the security

13  perimeter. It was right near the American Stock Exchange. It

14  was in the back (indicating) street.

15  Q.  What street is that?

16  A.  I can't recall. It's in my memo book (indicating).

17  Q.  Do you have your memo book with you?

18  A.  Yes, actually, I do. (Searching.)

19      (Handing.)

20  Q.  Do you mind if we make a copy of this?

21  A.  Sure.

22  Q.  Okay.

23      So you worked perimeter, security, and would

24  the area that you guarded, would it change or would it be

25  consistent with the same area?

1    A.    No, it would be different posts.  I worked various

2  posts around the perimeter.

3    Q.    And where was the perimeter?

4    A.    Where was the perimeter?

5    Q.    Yeah.

6    A.    It was where the footsteps were.  Were the towers

7  were -- was.

8    Q.    What streets?  What streets are we talking about?

9    A.    Church, Vesey -- I can't recall all of them.  West

10 Side Highway (indicating).

11   Q.    Okay.

12   A.    Any -- you know.  Streets around the perimeter.  I

13 would have to refer to my memo book.

14   Q.    You want to take a look?  Would it help you?

15   A.    Sure.

16   Q.    (Handing.)

17   A.    Okay.

18         (Searching.)

19         Well, I have December 8th, I did an 0600 by

20 1800 Ground Zero detail, and -- let's see.

21   Q.    My next question was going to be how frequently

22 would you go volunteer and work security at the, at the site?

23 On the perimeter?

24   A.    How often?

25   Q.    Yeah.

1          A.     I worked a total of twenty-seven times.

2          Q.     Between what months?

3          A.     From December 2001 till May 2002.

4                 This one says Vesey and West Street

5    (indicating).

6          Q.     And --

7          A.     I'm sorry.  And Broadway and Fulton was the

8    location I had to work.  That's where you had to work.  Vesey

9    and West Street.

10         Q.     Were there any other incidents that occurred during

11   that time period other than, you know, your arresting the guy

12   that refused to wear his badge?

13         A.     Were there other incidents?  No.  No.

14         Q.     Okay.  And did you ever work at the site itself, or

15   just always worked in the perimeter?

16         A.     Well, you were in the site.  You know.  The site

17   (indicating) -- the pit was right there (indicating).

18         Q.     I know, but you were on the outside?

19         A.     No, not really.  You were within the site.  You had

20   to go in through (indicating) the security gates to enter the

21   site.

22         Q.     But did you do anything other than work security?

23         A.     No.  In terms of working on the pile and stuff?

24         Q.     Yes.

25         A.     No.  No.

1      Q.    Okay.

2      A.    Security.

3      Q.    And what happened in May 2002 that led you to stop

4   working security at the site?

5      A.    They no longer needed us.

6      Q.    Okay.  And during that time period, December to

7   May, did you continue to work 7:30 to 4, because you did

8   mention that at one point you worked later?

9      A.    Other than working this detail or other details, I

10   had a steady day tour.

11      Q.    Okay.

12      A.    Yeah.

13      Q.    And you had your regular days off?

14      A.    And my regular days off, yes.

15      Q.    And can you look back to page D518?

16      A.    Sure.

17            (Searching.)

18      Q.    Exhibit C it is.

19      A.    I don't have 518 -- oh, I do.  Okay.

20      Q.    Because you took two sick days in June

21   (indicating)?  Of 2002?  Do you have any memory of why you were

22   out sick?

23      A.    No.

24      Q.    Did you have some cold or something?

25      A.    Not really.

1    Q.    Okay.

2    A.    And we had merged?

3          I'm assuming.  Okay.

4          MR. PROFETA:  Let's mark this as W, please.

5          (Whereupon, the aforementioned document was

6          marked as Defendants' Exhibit W for identification

7          as of this date by the Reporter.)

8    Q.    Do you recognize this document, sir?

9          (Handing.)

10   A.    (Searching.)

11         Not really.  I mean I know I signed it, but --

12   Q.    You did sign it?

13   A.    Yeah (indicating).

14   Q.    Okay.

15   A.    Well, that's my handwriting there (indicating).

16   Q.    Okay.

17   A.    Was this the day that Dr. Lamstein was going to

18   survey me off?  I don't know what this is from.

19   Q.    But you did get it, and you did sign it?

20   A.    Yeah.  Um-hmm.

21   Q.    Okay.

22         MR. PROFETA:  Let's mark this as X.

23         (Whereupon, the aforementioned medical board

24         document was marked as Defendants' Exhibit X for

25         identification as of this date by the Reporter.)

1      Q.    Could you identify that document, please.

2            (Handing.)

3      A.    (Searching.)

4            This is, this is from the medical board to the

5      board of trustees.

6      Q.    Okay.  Have you seen this before?

7      A.    No.

8      Q.    You've never seen it before?

9      A.    It was in my case (indicating).  That was about it.

10     Q.    Okay.

11     A.    It's signed by the medical board and staff.

12     Q.    Is there anything in here that appears inaccurate?

13     A.    Well, here, here it says two more missions?  I'm

14     thinking three, but I thought there was four.

15     Q.    Okay.  Anything else?

16     A.    No.

17     Q.    Okay.  And you did appear before the medical board?

18     A.    I -- yeah.

19     Q.    Is there anything that you told the medical board

20     that's not reflected in here?  As far as you remember?

21     A.    I don't know, I don't know what psychomotor

22     retardation is.

23     Q.    Anything else?

24     A.    I don't see anything incorrect.

25     Q.    Or incomplete?

1       A.      Incomplete.

2       Q.      All right.

3               MR. PROFETA:  Let's mark this as Y, please.

4               (Whereupon, the aforementioned application for

5       accidental disability retirement was marked as

6       Defendants' Exhibit Y for identification as of this

7       date by the Reporter.)

8       Q.      Here, sir.

9               (Handing.)

10      A.      (Searching.)

11              Okay?

12      Q.      Can you identify that document, please?

13      A.      It's an application for, for accidental disability

14      retirement.

15      Q.      So did you file this in response to the medical

16      board finding that you were entitled to an ordinary disability

17      retirement?

18      A.      No.

19              My -- I was actually told do this by my lawyer

20      at that time, Allen Friese (phonetic).  He was the one that

21      recommended that I do this immediately.

22      Q.      Okay.  And how long had Allen Friese been your

23      lawyer?

24      A.      He handled my departmental trial --

25      Q.      Yes.

1    A.    -- and then retired after that.

2    Q.    Okay.  And when did you first see Allen Friese?

3    A.    It was after one of my hospitalizations.  I believe

4  the third.  Third one.

5    Q.    So --

6    A.    Third or fourth.

7    Q.    So was this like March 2003?

8    A.    It had to have been later than that.

9    Q.    When you --

10    A.    It was, it was -- you know.  Like when I had the

11  PBA attorneys telling me that, you know, all is lost, I'm going

12  to lose my job, I was hospitalized, at that time I had found

13  out about Allen Friese and contacted him after I got, um,

14  released from that hospitalization.

15    Q.    Okay.  And --

16    A.    That's why I strongly think it was four times I was

17  hospitalized.  They only have three times, I don't --

18    Q.    You had a PBA lawyer and you had Allen Friese?

19    A.    I had a PBA attorney at first handling the criminal

20  part.

21    Q.    Okay.

22    A.    And then with the departmental part -- I had Allen

23  Friese representing me for that.

24    Q.    And he continued to represent you until sometime in

25  2005; is that right?

1      A.    Yeah, around 2005.  After it was settled.

2      Q.    Okay.

3      A.    Before I would -- retired, he had told me that he

4  was -- he had retired.  He had --

5      Q.    Okay.

6      A.    -- closed up shop.

7      Q.    And were you aware when you filed or signed what

8  has been marked as Exhibit Y (indicating), were you aware that

9  the pension board had found you entitled to a regular

10  disability pension?

11      A.    No.

12      Q.    You hadn't known that?

13      A.    No.

14      Q.    Okay.

15      A.    No.

16            This was, this was done (indicating) -- this

17  was submitted before they made their final decision with me.

18      Q.    Okay.  And when did you find out about the pension

19  board determination that you were entitled to an ordinary

20  disability pension?

21      A.    I really can't recall the day that I had last met

22  them and they made that -- it had to have been in, I guess,

23  later 2004.

24      Q.    Okay.

25      A.    You know.  Or May?  I'm sure it was around this

1    time.  I'm not -- I really can't recall the, the time.

2         Q.    All right.  And the handwriting on Exhibit Y,

3    that's yours?  Is that your handwriting?

4         A.    Yes.

5         Q.    What was your understanding of what Exhibit Y was

6    going to accomplish?  What were you going to do with this?

7         A.    Well, Allen wanted to sue.  For my accidental

8    disability.

9         Q.    Okay.  He wanted to sue the Police Department?

10        A.    Yeah.  Or whoever he had to sue.

11        Q.    On the grounds that your retirement should have

12   been because of 9-11?

13        A.    Of 9-11, yeah.

14        Q.    And this is back in June of 2004?

15        A.    Yes.

16        Q.    Okay.

17              MR. PROFETA:  Let's mark this as Z.

18              (Whereupon, the aforementioned marginal

19              performance evaluation was marked as Defendants'

20              Exhibit Z for identification as of this date by the

21              Reporter.)

22        Q.    Have you ever seen this document before.

23              (Handing.)

24        A.    (Searching.)

25              No.

1    Q.    They just wanted you to come in?

2    A.    They wanted me to report the next day, yes.

3    Q.    And -- so nobody told your parents why they wanted

4  you to come in?

5    A.    No.

6    Q.    So you went back -- you went in the next day at

7  9:00?

8    A.    Yeah.

9    Q.    And then what happened?

10   A.    I signed in.

11   Q.    What floor did you go to?

12   A.    The fourth floor.

13   Q.    At One Police Plaza?

14   A.    At One Police Plaza.

15   Q.    And what happened?

16   A.    I signed in, went to room 402, that's where they

17 told me to report to --

18   Q.    Okay.

19   A.    -- and there was a PAA sitting at the desk, I told

20 her that I'm supposed to meet with a Kathleen Kearns, and she

21 made a phone call (indicating), I assume that she called her

22 and told her that, you know, that I was here.

23   Q.    Yes.

24   A.    And to wait.  And I sat, you know, in one of the

25 chairs, and I believe around 10:30, that's when she finally

1    called me in to her office.

2         Q.    And what did she tell you?

3         A.    She held up that agreement form (indicating) --

4         Q.    (Indicating.)

5         A.    No.  The other one.

6         Q.    (Indicating.)

7         A.    That one.

8         Q.    Defendants' Exhibit CC?

9         A.    And she held this up and she says, do you recall,

10   do you remember signing this.

11        Q.    Okay.

12        A.    I said, not really.  And -- it's hard to really

13   recall exactly everything, because it's been a while, the

14   statement that I made is more accurate (indicating), but she

15   said something to the effect that you agreed to waive all

16   accrued time, and, um, if you don't accept the, the new pension

17   that we're going to have you -- we're going to have drawn up,

18   you face termination.

19        Q.    And what did you say to her?

20        A.    I said what?  What are you, what are you -- I was

21   in shock.  I was like what are you talking about.  And she

22   said, well, just, you know, wait outside, and we'll get it

23   drawn up, and we need you to sign it, and I was like, well, you

24   know, I don't know what's going on, but she was just, you know,

25   she wasn't really listening to what I had to say.  And then I




1    had also said to her, you know, you know, listen, I, I don't

2    need this kind of stress.  I'm already suffering from PTSD, and

3    depression, anxiety, and, and she was like, you know, just

4    (inaudible).  She didn't care, you know, what I said.

5         Q.    So she told you to wait outside again?

6         A.    She told me to go outside.  And wait for the

7    drawn-up pension.  And I'm like, I have a million questions.

8    I'm like what, where, who, when?  What are they talking about.

9    New pension?  And I made some phone calls, I had called --

10        Q.    And so you had a phone that you could call?

11        A.    I had a cell phone.

12        Q.    Okay.

13        A.    And I called Dr. Lamstein.

14        Q.    Were you by yourself?

15        A.    Yes, I was.

16        Q.    And you weren't in some room?

17        A.    No.  I was outside, in the hallway.

18        Q.    You were sitting in the hall?

19        A.    Not sitting in the hall, standing in the hall.

20        Q.    And you were told that you had to stay in the hall?

21        A.    She told me to go outside in the hallway while they

22   have it drawn up.

23        Q.    Okay.

24        A.    (No verbal response.)

25        Q.    And that's when you --



1    A.    That's when I made phone calls.  Because I wanted

2    answers.

3    Q.    Who did you call?

4    A.    I called Dr. Lamstein, I called Allen Friese,

5    and --

6    Q.    He's your lawyer?

7    A.    And I called Jeff Goldberg's office.

8    Q.    Okay.

9    A.    We were already in contact.  We had come -- I had

10   come for an initial consultation prior to this.

11   Q.    Okay.

12   A.    Because I wanted them to handle the accidental

13   disability part.  You know?  Because Jeff -- Allen Friese had

14   retired.

15   Q.    Okay.

16   A.    Yeah.

17   Q.    All right.  So you made a bunch of phone calls, and

18   then what happened?

19   A.    I don't -- I can't recall if it was the second

20   time I was -- actually, I was -- I had gotten calls back from

21   Dr. Lamstein at that time, I believe, and she said -- I told

22   her what is going on, and she said she's going to make some

23   phone calls and she'd get back to me.

24   Q.    Okay.

25   A.    Like I said, prior to this, I was under the

1  assumption that she was going to guarantee me to my tenth

2  year. You know?

3      Q.    Okay.

4      A.    And, so, you know, she said she was going make some

5  phone calls, and Allen Friese, I believe, had called back, and

6  he said he already had spoken with them --

7      Q.    Right?

8      A.    -- and, you know, and I said, do I need

9  representation for this, and he said, no, you don't need any

10 representation for it, you know, and just go along with what

11 they want. Don't, you know -- I told him that you're not

12 going to, you know, you know, that you're going to do whatever

13 they want you to do. You know. He said something along those

14 lines.

15     Q.    Right?

16     A.    And I can't recall if I spoke to -- I made some

17 more phone calls, I believe, to Jeff's office --

18     Q.    Okay. So you spoke to Ms. Kearns for, what, like

19 twenty minutes?

20     A.    Not even. Like five minutes.

21     Q.    And then she told you to wait out in the hall?

22     A.    Yeah.

23            It was very abrupt. She said this is the way

24 it is, deal with it, or we're going to terminate you. Go

25 outside. You know? And I went outside and that's when I



1    started making phone calls.  Because at that point, I was, you

2    know, I was scared.

3        Q.    And then what happened?

4        A.    I had made some -- I think I called Jeff's office

5    a couple more times, you know, telling the secretary I really

6    need to speak to them about what's going on here, you know, the

7    seriousness of it, and I had spoken to them, I think it was

8    Jeff and then he transferred me to Eric, I don't recall

9    verbatim exactly the steps that were taken.

10       Q.    All right.  And how long were you waiting out in

11   the hall?

12       A.    It was -- I don't know.  Between five, ten

13   minutes, maybe?  I wasn't timing it.  It was a while, though.

14   It wasn't like immediately.

15       Q.    And then you made your phone calls, and then?

16       A.    So then Eric had, um, said, well, why don't you,

17   you know, give her my card and say that you need a day or two

18   to properly retain us and confer with us with this matter.  And

19   I did.  I went inside and I, I said these are my new lawyers,

20   and they'll be representing me, and she, she took their, you

21   know, name and number down and stuff, and said that she'd have

22   to confer with her commissioner about this, but as far as she

23   knew, Allen Friese was my attorney that represented me, and

24   he's the one that's going to have to, you know, represent me

25   for this now.  You know.



1      Q.    And what happened next?

2      A.    She said, um, you can't leave the building.  You

3   can go up to the ninth floor to get something to eat or drink,

4   but that's it.  And you, you know, I want you to come back down

5   here.

6      Q.    So you were under orders to stay in the building?

7      A.    Yes.

8      Q.    Okay.  And did you ever try to leave the building?

9      A.    No.

10      Q.    So then what happened?

11      A.    Went up to the ninth floor.  At that time I needed

12   something cold to drink, and I got a bottle of water, and I

13   went down to the sixth floor, the identification section,

14   and --

15      Q.    And where you used to work?

16      A.    Where I used to work.

17      Q.    Right?

18      A.    And I spoke to Lieutenant Monaghan, and Officer

19   Desio, Sal Desio, and I don't know how long I was there, but it

20   was around 12, 12:30, between that time, that Sergeant Andahar

21   came looking for me, they had called, I guess, there to see if

22   I was there, and she said, um, you need to go down, back

23   downstairs.  They want to speak to you.

24      Q.    Back to the sixth floor?

25      A.    Down to the fourth floor.



1    Q.    I'm sorry.  The 4th floor?

2    A.    And to ask for a Sergeant Slevin, I believe.

3    Q.    And then what happened?

4    A.    Went down, and I came out the stairwell, I came

5    out, was on the other side of her office, and there was an

6    office there with PAAs and I said I'm looking for a Sergeant

7    Slevin, you know, and one of the PAs came out and walked me to

8    the other side (indicating), and when they -- when the

9    hallway -- you have the elevators there (indicating), when she

10   walked me through that hallway, there were a bunch of cops

11   waiting near this room, which was 4023A, it turned out to be

12   later, which was across the hallway from Kathleen Kearns'

13   office.  It was a locked room, Lieutenant Princi had to unlock

14   it.  And the PA did like one of these (indicating), you know,

15   finger pointing towards me, like this is him, and they quickly

16   called me over and they said we need you to come into this room

17   and have a seat.

18             I go into the room, it's a table with chairs,

19   there was a phone there (indicating), no windows, now, it

20   looked like a room that they used for questioning, and

21   interviewing, and stuff.  Interrogating.  It wasn't an office,

22   per se, type room.

23   Q.    No windows?

24   A.    No windows.  It was windowless, yeah.

25   Q.    Yes.

1     A.   So they sat me down, and there was another

2   sergeant, um, he introduced -- I think his name was Ciasio, he

3   was in civilian attire, white male, and he sat down from across

4   from me, and looked very angry.  And now I'm like, you know,

5   curious as to why I'm here.  And I'm like why am I here, why am

6   I being held here --

7     Q.   You said that?

8     A.   I asked him.  I said why am I here, and he, he

9   said, I don't know.  I, I can't answer that for you.  You know.

10     Q.   Did he do anything to make you think he was angry?

11   Or he just looked angry?

12     A.   He looked angry.

13     Q.   He just looked angry?

14     A.   Yeah.

15     Q.   He didn't say anything, no?

16     A.   No.  He didn't say I'm angry, or anything like

17   that.  He just looked angry.

18     Q.   So then what happened?

19     A.   Well, he said he didn't know why, you know, why I

20   was here, being held in the room, and we sat there, and they,

21   you know, they had the -- I don't know -- the door was open

22   (indicating), I guess, it wasn't completely -- it wasn't

23   closed, it was open, and somebody had called him out, I think,

24   I think it was Lieutenant Princi that -- Lieutenant Princi was

25   throughout the whole day supervising this thing, and he was the

1    one that called him out, and -- well, let me just backtrack.

2                While he was there, I recall that Lieutenant,

3    Lieutenant Princi came in and asked me if I ever tried to kill

4    myself. He said have you ever tried to kill yourself. And I

5    looked at him, like in shock, like what are you getting at?

6    Why are you asking me this? I didn't say that, but I'm

7    thinking this. Like I'm confused as to why he's saying this.

8                And I said, well, I attempted, you know,

9    suicide when I was hospitalized. And that was it, and he

10   walked out, and that's when they called the other sergeant out,

11   and that's when I, I believe at that time that's when another

12   sergeant, Perrugia, from early intervention was called down, I

13   guess they called him down from early intervention, and he came

14   in and he closed the door and he sat with me and he acted like

15   he was my best friend, and --

16        Q.    What did he say to you?

17        A.    He was, he was like, so how are you feeling, you

18   know? And I said, well, I'm wondering why I'm here, you know,

19   I'm a little scared, and, you know, he's -- he went into this

20   diatribe of, you know, this, this job isn't all that it's

21   worth, and there's really no need to be upset about anything,

22   you know. And I saw where he was going with this. He was

23   basically just trying to convince me to doing what they wanted

24   me to do, and, and I was like, listen, I don't want to talk to

25   you.

1    Q.    Well, do you think they were worried that you might

2    commit suicide?

3    A.    No.

4    Q.    Well, do you know why --

5    A.    There was no reason for that.  I wasn't acting

6    erratic, I wasn't acting in an odd behavior.  I was

7    professional, I was acting in a professional manner.  I was

8    worried and concerned, but I wasn't acting in any type of

9    inappropriate type of behavior that they could have been

10   concerned for me.

11   Q.    But they did ask you if you had tried to commit

12   suicide?

13   A.    Well, Lieutenant Princi came in and asked me.

14   Which, you know, kind of shocked me.  Why are you asking me

15   this.  You know?

16   Q.    So then what happened?

17   A.    So then, after speaking with Sergeant Perrugia, he

18   gave me his business card, and shook my hand, and left, and --

19   Q.    So after you indicated you didn't want to talk to

20   him, he left?

21   A.    Yes.

22   Q.    Okay.

23   A.    And I believe at that time that's when Lieutenant

24   Princi and Captain Lucianni came in and Lieutenant Princi asked

25   me to stand up, told me to empty my pockets, and I had change,

1    and a wallet, and keys, and a pen, and the card that Sergeant

2    Perrugia had given me, which I used to write down names and

3    times throughout the day, and he patted me down.

4         Q.    Because they were concerned you might have a

5    weapon?

6         A.    I, I, I believe I asked him why, and he says we

7    just want to make sure you have no weapons on you.  They didn't

8    go into any big explanation.

9         Q.    And then after that --

10        A.    They were very vague.

11        Q.    And after that you put your stuff back in your

12   pockets?

13        A.    I asked them.  I said am I allowed to put my stuff

14   back -- I was scared at that point.  At that point, being

15   patted down, something's up.  I thought I was going to get

16   arrested.

17        Q.    Why did you think you would get arrested?

18        A.    I mean why else?  Why would you get patted down.

19        Q.    Well, if he thought you had a weapon --

20        A.    To me, that tells me if you look up somebody and

21   you pat them down --

22        Q.    But there was a concern that you had a weapon?

23        A.    No, there was not, but they -- that's what I

24   felt.  I am telling you what I felt.

25        Q.    Okay.



1        A.    I felt like I was in big trouble.  That something

2    bad was going on here.

3        Q.    Okay.  So then what happened?

4        A.    Well, at that point I was scared, and I asked them

5    if I can put my stuff back in my pocket, and they said yes.

6        Q.    Yes.

7        A.    And then they left.  Then they walked out, and I

8    think that, at that point they had Police Officer Baio come in

9    and sat there with me.  But they had a female sergeant outside

10   (indicating), Lieutenant Princi was outside, and I'm talking

11   right out the door.  Not wandering around.  Like there was a

12   police guard outside as well as a policeman inside.

13       Q.    And the door was open?  You saw what was going on

14   outside?

15       A.    Yeah, I saw what was going on.  And there was a lot

16   of movement going on.  They were switching bodies, and people

17   were coming in.  But when Police Officer Baio came in, he sat

18   down in front of me, you know, across from me (indicating) --

19       Q.    Yes.

20       A.    -- and at that point I just, just wondering what is

21   going on here.

22       Q.    Okay.

23       A.    At one point between the shifts of bodies, I had

24   called, um -- I was in constant contact with Eric throughout

25   the day, and I was -- I called down -- I called to my unit,



1      and I --

2                  THE COURT REPORTER:  One moment, please.

3                  (Whereupon, a short recess was taken.)

4                  THE COURT REPORTER:  Thank you.

5                  MR. PROFETA:  Can you read back like the last

6            little bit.

7                  (Whereupon, the record was read back by the

8            Reporter.)

9      Q.    Go ahead.

10     A.    Let me just finish that part that I had spoken to

11     Lieutenant Monaghan, and I had contacted him, and I told him

12     what they were doing, which I wanted to add to this that I had

13     forgotten to say that they were going to -- they had --

14     Sergeant Perrugia, as well as Lieutenant Princi, separately had

15     told me that they were going to have me see Dr. Lamstein at

16     psych services.

17     Q.    Did they say why?

18     A.    No.

19     Q.    Did anything lead you to feel like you were going

20     to be arrested other than the being patted down?  Was there

21     anything else that made you feel like you might be arrested?

22     A.    It, it implied that I was in trouble.

23     Q.    Okay, but anything other than the patting down?

24     Was there anything else that led you to believe that you were

25     going to be arrested?

1      A.    The -- well, the police guard.  That's not

2 normal.  Or mean that intimidated me somewhat.  Having a

3 policeman watch me, and have police outside the room.  That

4 tells me something serious is going on.

5      Q.    And people were --

6      A.    Being asked to sit in a room?  And you cannot move

7 from that room?

8      Q.    Well, did you ever try to go out of the room?

9      A.    Yes, I did.

10      Q.    And what happened?

11      A.    I had to be escorted.  I asked -- well, actually,

12 at one time I said, can I get some water, and Sergeant Slevin,

13 the female, said, well, I'll fill that up for you (indicating),

14 and then at one time I asked if I can go to the bathroom.  They

15 said, well, you're going to have to have Officer Baio escort

16 you to the bathroom.  And I had to have him escort me to the

17 bathroom.

18      Q.    And this was after Lieutenant Princi asked you if

19 you had ever attempted suicide?

20      A.    Yes.  This was later on in the day.

21      Q.    Okay.

22      A.    I think I stated already that Sergeant Perrugia had

23 told me that they wanted me to see -- they were going to send

24 me to see Dr. Lamstein, and after the pat-down, that's when

25 Lieutenant Princi told me that they're waiting for a car to

1    send me to see Dr. Lamstein.

2        Q.    And did they say why?

3        A.    I asked why, and got no response.

4        Q.    They wouldn't even say anything?

5        A.    No.

6        Q.    Okay.  And then what happened?

7        A.    Well, that's when I had the police -- now Officer

8    Baio across from me (indicating), and there was a police guard

9    outside, you know, the sergeant and Lieutenant Princi and

10   their, you know, there was another officer outside, a

11   plainclothes officer.

12       Q.    And they were just sitting outside?

13       A.    They were, they were watching.  They were like they

14   were standing there and especially the female sergeant, it was

15   a constant visual.  Always looking.  And just sitting there.

16   There was -- you know.  I wasn't really watching them all the

17   time, but there was always somebody there, watching in

18   (indicating), watching us.

19       Q.    All right.  And then what happened?

20       A.    Well, Katherine Lamstein had come in throughout the

21   day, wanting me to sign the new proposed settlement, and I

22   believe she came in at that point, and she see, um, are you

23   ready to sign the new proposed settlement, and, um, that we

24   have -- she had told me that we have it worked out at pension

25   section and you're going to have to come with me, and --

1        Q.      And the new proposed settlement was going to be

2    with the January retirement date, is that right?

3        A.      She didn't say anything to that effect.  Just the

4    new proposed settlement.  And are you ready to sign it.  And I

5    said I need a day to confer.  You know.  I need a day to confer

6    with my new lawyer in order to retain him, and, and I need to

7    speak to him about that.  And she said no, you can't leave, and

8    you face termination if you don't sign.

9        Q.      Okay.

10        A.      And --

11        Q.      Did you ever sign it?

12        A.      No.  No.

13        Q.      You never did?

14        A.      No.  No.

15        Q.      Okay.

16        A.      I -- you know.  If it wasn't for being in contact,

17    in constant contact with Eric -- they were trying to break my

18    will.  That's what they were trying to do.  I don't care what

19    anybody is trying to explain, or you could argue this fact,

20    they were trying to break my will in order to submit, have me

21    submit to their will and sign it.  And, and --

22        Q.      So you -- I'm sorry.  You can finish.

23        A.      So she had come out -- come in throughout the day,

24    and at one time I had Eric on the phone, and he -- and she

25    came in, and, um, this was like, you know, switching of the

1    guard, you know, they had people constantly coming in, they

2    would call Police Officer Baio out and have somebody fill in

3    for him then he would come back in, and in between those breaks

4    I would call him, I was in constant contact, and Eric was on

5    the phone, and he said, he said, he said is she there, and she

6    just came in.  I said she just came in now, Eric.  And he says,

7    well, hand the phone over to her, let me speak to her.  I said

8    I have Eric Sanders on the phone, he wants to speak to you.

9            Like a child, she throws a temper tantrum,

10   waving her hands in the air, saying I don't know any Eric

11   Sanders, and I'm not speaking to anybody, and she ran out of

12   the room.

13       Q.    This is Dr. Lamstein?

14       A.    This is Kearns.

15       Q.    Oh, Kathleen Kearns?

16       A.    Yes.

17       Q.    You were talking about Kathleen Kearns earlier

18   also, right?

19       A.    Yes.

20       Q.    So Kathleen Kearns comes in?

21       A.    Yes.  That was one of the periodic times that she

22   came in.  And I had Eric on the phone.

23       Q.    Okay.  And did Dr. Lamstein come to see you?

24       A.    No.  That was later on in the day.

25       Q.    Okay.



1     A.    Towards the end.

2     Q.    How many times --

3     A.    I was there, I was there -- I was there for about

4     four hours.  Well over four hours.

5     Q.    In that room?

6     A.    Yes.

7     Q.    And there was always somebody in the room with you?

8     A.    It would either be Police Officer Baio or, like I

9     said, the -- it was a male black police officer in civilian

10    attire that would switch off with him.

11    Q.    Okay.

12    A.    And, and, and then at one point Lieutenant Princi

13    had come in -- I mean -- I had spoken to Eric again, on one

14    of those shifts, and he asked next time you see a supervisor,

15    you ask him by whose authority he's keeping you there, and I

16    had asked Lieutenant Princi when he came in, I said I need to

17    know by whose authority are you keeping me here, and he said by

18    the order of Captain Lucianni, and you're still a police

19    officer, and you have to follow orders.  And he walked out.

20    Q.    So you were under orders to stay in that room?

21    A.    I was being ordered to stay in that room.

22    Q.    And the times that you tried to leave the room?

23    How many times did you try to leave the room?

24    A.    I only tried that one time when I had to go to the

25    bathroom.  And I had a police escort.

1     Q.    That's the only time you tried to leave?

2     A.    That's the only time I tried.

3           I was scared.  I mean I'm thinking if I try to

4     run out of there, they're going tackle me and arrest me and put

5     the handcuffs on me.  I mean you have a police guard there.

6     You have people coming in, trying -- wanting you to sign this

7     or you face termination.  And it's intimidating.  It's not

8     friendly.  It's not a fun environment.  It's a very

9     intimidating, fearful environment.  And it's the department's

10    advocate's office, you can ask any cop, fear coming to their

11    eyes of that place.  Cops are just scared of the department's

12    advocate's office.  I can't tell you the level of anxiety I had

13    when I just got there to sign in.

14    Q.    So the two times you tried to leave that one was

15    one time to get water and somebody got you water and the other

16    time to go to the bathroom?

17    A.    Right.

18    Q.    And you were under orders to stay in that room?

19    A.    That's right.

20    Q.    And that's why you stayed in the room?

21    A.    That's right.  Because they had me convinced now

22    that I was still employed, and I'm still a police officer, and

23    they're talking about facing termination.  I didn't want to get

24    fired.  You know.  I'm trying to do the best I can to wiggle my

25    way out of this situation without getting fired.  You know?  I

1  didn't want to get fired.

2      Q.    And you also didn't want to sign what they wanted

3  you to sign?

4      A.    No.  Because, like I said, I was in constant

5  contact with Eric, and he was telling me, you don't have to

6  sign that.  And they cannot keep you there against your will.

7  You know?  And that's why he was asking me these questions to

8  ask him.  You know.

9      Q.    So whenever you wanted to call Eric, you did?

10     A.    Well, you didn't make -- I didn't make an effort

11  to call when I was being watched, but when they were switching

12  off, that's what I made the phone calls and stuff, and they

13  would hear my conversations outside, and they would -- they

14  wouldn't come in.  They would hear them and stuff, and I was

15  telling Eric, I'm scared, Eric.  I want to go home.  I can't

16  believe they're holding me here.  Then when I finished the

17  conversation, that's when they'd send somebody else in.

18     Q.    And, so, you were in that room and the door was

19  open, there was always somebody in the room with you?

20     A.    Yes.

21     Q.    And then what happened?

22     A.    Well, you know, basically they would, they would,

23  they continued hold me there, and I had a police officer close

24  to me, it was mostly Police Officer Baio and then he tried with

25  the, you know, well, this job isn't everything, and --

1          Q.    He also did that?

2          A.    Yeah, he tried also.  You know.  He tried to

3    convince me to sign.  You know.  It's no big deal.  And I got

4    angry about it.

5          Q.    Were you getting angry about it?

6          A.    I was, at that point I was sad, angry, scared,

7    my -- I was anxious, my anxiety level was through the roof.  I

8    mean I was going through a gamut of emotions.

9          Q.    Okay.

10         A.    You know?  I was confused.  I didn't know who was

11   telling the truth.  Who to believe.

12         Q.    And then what happened?

13         A.    Well, like I said, Kearns would come in, you know,

14   once in a while, and ask me again, you know, are you ready to

15   sign.

16         Q.    Right.

17         A.    And I would say, no, I'm not going to sign.  Well,

18   okay, then, and you face termination.  And they'd walk out

19   again.  I'd say she came in about four, five times throughout

20   the day.

21         Q.    And then did Dr. Lamstein come in?

22         A.    Well, that was, that was around 3:30.  Around that

23   time.

24         Q.    Okay.

25         A.    Dr. Propper and Dr. Lamstein came into the room.



1    Q.    And what did they tell you?

2    A.    They sat down across from me, and they gave me

3    this, you know, smile, and they were like, so how you doing,

4    and I told them I'm, I'm scared, I, I shouldn't be held against

5    my will here, I want to go home, I want to go home to my

6    family.  I want to speak to my lawyers.  Well, um, do you have

7    a -- do you have a thought of killing yourself they asked me?

8    Like do I have a plan of killing myself, or if they release me,

9    you know, do I intend to kill myself and stuff.  I said no.

10   Well, do you have a plan for tomorrow?  I said yeah.  I have an

11   appointment with my therapist, Mary Gibbons, and I will talk to

12   her about it.

13   Q.    Okay.  And did you talk to your parents at all

14   during the day?

15   A.    I had spoken to my mom earlier in the day, when

16   Kearns sent me out the first time into the hallway, I called my

17   mom and I told her and I said, I said I can't believe they're

18   doing this to me, mom, and, you know, they're telling me now I

19   might get fired for this, and she started crying.  She started

20   crying.

21   Q.    Did you talk to your parents at all after that?

22   A.    No, not throughout that time.  I, I had called them

23   after, when they finally released me, and I left the building,

24   and I spoke to Eric and they told me to come in the next day.

25   Q.    Just for the record, Eric is Eric Sanders?

1        A.    Yes, Eric Sanders.

2        Q.    So how long did you talk to Dr. Lamstein and

3    Dr. Propper?

4        A.    It was, it was just a couple of minutes.  It was

5    just a couple of minutes.

6              And I was just, at that time I didn't want to

7    speak to anybody affiliated with the Police Department.  I

8    just, I told them, you know, Dr. Lamstein, she started again

9    with the money thing, you know, and she was like $1300 a

10   month.  You know.  And at that point it would call me back to

11   when she, you know, had, had my confidence the last time?  When

12   she was telling me she was going to survey me, but she can get

13   me the ten years?

14             And I, at that point I said, listen, I don't

15   want to speak to neither of you, you need -- just don't waste

16   your time with me.

17       Q.    Okay.

18       A.    And they got up, they got nervous and they got up

19   and they walked out, and Kathleen Kearns came in again, and are

20   you ready to sign the papers?  You know?  And I said no.  No.

21   I'm not signing anything.

22             Now at this point I was just telling them flat

23   out no.  Like don't -- like my attitude was don't waste your

24   time with me.  You know?

25       Q.    And then what happened?



1    A.    She said, well, then you're going to have to wait,

2   wait for our decision then.  You know?

3              And the mood and the manner and the way she

4   spoke me throughout the day was of intimidation, was of, of a

5   way to make me nervous, and this wasn't like a happy time.  You

6   know?  Let's talk to you on a friendly basis, and be

7   professional, polite to you.  It was bully time.  It was

8   intimidation time.

9              And she tried to scare me.  She tried to make

10  me worry and pressure me into signing this thing.

11   Q.    But you didn't sign it?

12   A.    I refused to sign.

13   Q.    And then what happened?

14   A.    Well, then Dr. Lamstein came in with authorization

15  papers, and she told me that she, you know, she wanted a chance

16  to speak with my therapist.  And, and just, you know, sign

17  right here, you know, and I said, I don't know why you're

18  asking me to sign this, Doc.  They're going to fire me.  At

19  that point I thought this is it.  They're going to fire me.

20   Q.    And then what happened?

21   A.    Well, she left, and then this was towards the end

22  of the day, and it was, I think, a little bit after 4, and, um,

23  Lieutenant Princi and Captain Lucianni came in.

24   Q.    Yes?

25   A.    And they said there's no need to sign, and we



1    reworked your pension, and as of such and such date, I believe

2    it was -- I really -- I think it was January 12th, or

3    something like that?  You're now officially retired.  And

4    congratulations.  And tried to make me feel good about it.

5        Q.    And did Dr. Lamstein tell you why she wanted you to

6    sign the authorizations?

7        A.    Yeah.  She said that she wanted a chance to speak

8    with my therapist.

9        Q.    And do you know if she did?

10       A.    I have no idea if she spoke to her or not.

11       Q.    Did she tell you why she wanted to talk to your

12   therapist?

13       A.    No.  No.

14       Q.    And then what happened?  Lieutenant Princi and --

15       A.    That's when -- they came in a short time after --

16   well, first Kathleen Kearns came in, trying it again, left, and

17   then a short time after that that's when Lieutenant Princi and

18   Captain Lucianni came.

19       Q.    And they went into the room, and --

20       A.    Yeah.

21       Q.    -- told you you could go home?

22       A.    Yeah.  Well, Captain Lucianni sat down across from

23   me (indicating), Lieutenant Princi was standing at the edge of

24   the table, it was like a table situated like this (indicating).

25       Q.    And they shook your hand, and then you left?

1   A.   At that point I was so elated that, finally, I'm
2   being let go, you I shook their hands, even though I detested
3   them.  I didn't want any more incidents.  You know.  This was
4   enough for me today.  And then they said the two police
5   officers follow me down.  Watch me.  They'd follow me into the
6   elevator, came down the elevator with me, and came out to the
7   lobby with me, watch me leave.  I got far -- I went out the
8   front entrance, and I got far enough away, that's when I called
9   them.  They told me that they had a lawyer on his way there, to
10  get me out of there.

11  Q.   And the whole time you were in that room, the door
12  was open, and you -- there was somebody outside?

13  A.   And inside.

14  Q.   Okay.  And were you ever physically restrained in
15  any way?

16  A.   (No verbal response.)

17  Q.   Nobody ever touched you?

18  A.   No.

19  Q.   Okay.

20       And your pension was changed?

21  A.   That's what they told me.

22  Q.   The date was changed?

23  A.   That's what they told me.

24  Q.   Okay.  And did you appear before the medical board
25  again?

## CERTIFICATE OF SERVICE

I hereby certify that on April 2, 2008, I caused to be served by first-class United States mail, postage pre-paid, true and correct copies of the annexed Profeta Reply Declaration and Exhibits In Further Support of Defendants' Motion for Summary Judgment by depositing same in a container under the control or custody of the U.S. Postal Service addressed to the following:

> Jeffrey L. Goldberg, P.C.
> Attorneys for Plaintiff
> 2001 Marcus Avenue, Suite S160
> Lake Success, New York 11042

this being the address designated by plaintiff for service.

Dated:      New York, New York
             April 2, 2008

_____
Lawrence J. Profeta

Case No. 06 Civ. 2897 (CPS)(CLP)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SCOTT CHERNOFF,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

**PROFETA REPLY DECLARATION AND EXHIBITS IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

*MICHAEL A. CARDOZO*
*Corporation Counsel of the City of New York*
*Attorney for Defendants*
*100 Church Street, Room 2-186*
*New York, N.Y. 10007*

*Of Counsel: Lawrence J. Profeta*
*Tel: (212) 788-0954*
*NYCLIS No. 05LE000170*

*Due and timely service is hereby admitted*

*New York, N.Y. .................................................*

*........................................, 200*

*........................................ Esq*

*Attorney for................................................*