UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------X

Scott Chernoff,

06-CV-2897
(CPS)(CLP)

Plaintiff,

- against -

MEMORANDUM
OPINION AND
ORDER

The City of New York; New York City Police
Pension Fund; Michael D. Welsome, Director
New York City Police Pension Fund; Raymond
Kelly, Police Commissioner; Julius
Mendel, M.D., Medical Board, New York City
Police Pension Fund; Richard Gasalberti, M.D.,
Medical Board, New York City Police Pension
Fund; Arsen Pankovich, M.D. Medical Board,
New York City Police Pension Fund, each being
sued individual and in their official
capacities as employees of the NYPD and/or
the NYCPFF,

Defendants.

-------------------------------------------X

SIFTON, Senior Judge.

   Plaintiff Scott Chernoff ("Chernoff") commenced this action

on June 9, 2006 against defendants the City of New York ("City");

the New York City Police Pension Fund (the "Police Pension

Fund"); Michael D. Welsome, Director of the New York City Police

Pension Fund; Raymond W. Kelly, Police Commissioner; Julius

Mendel, M.D., Richard Gasalberti, M.D., and Arsen Pankovich,

M.D., of the New York City Police Pension Fund Medical Board;

Julie L. Schwartz, Kathleen M. Kearns, Louis W. Luciani, Carl

Princi, Walter Cacaj, and John Doe Police Officers # 1-4, of the

New York Police Department ("NYPD") Advocate's Office, each sued

in their individual and official capacities.  The following
claims remain to be determined:[1]  (1) disability discrimination
claim in violation of the Americans with Disabilities Act;[2] (2)
disability discrimination claim in violation of 42 U.S.C. § 1983[3]
against the individual defendants in their individual and
official capacities; (3) claim for violation of the right to
procedural and substantive due process of law in violation of 42
U.S.C. § 1983; (4) claim for violation of the right to procedural
and substantive due process of law in violation of the fifth
amendment; (5) disability discrimination claim against the City
for violation of New York State Executive Law 296;[4] and (6)

---

[1] On November 19, 2007, the parties stipulated to the dismissal of the
following defendants with prejudice: Julie L. Schwartz, Kathleen N. Kearns,
Louis W. Luciani, Carl Princi, Walter Cacaj, and John Doe Police Officers 1-4.
The parties also agreed to the withdrawal of the following claims with
prejudice: false imprisonment, abuse of authority, infringement of right to
due process, and conspiracy to interfere with civil rights.  After defendants
filed the instant motion, plaintiff stipulated to the dismissal of all
retaliation and hostile work environment claims under the ADA, section 1983,
New York State Human Rights Law, and New York City Human Rights Law.
Accordingly, I do not address them here.

[2] Under the Americans with Disabilities Act, "[n]o covered entity shall
discriminate against a qualified individual with a disability because of the
disability of such individual in regard to . . . [the] terms, conditions, and
privileges of employment."  42 U.S.C. § 12101.

[3] 42 U.S.C. § 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation,
custom, or usage, of any State . . . subjects, or causes to be
subjected, any citizen of the United States . . . to the deprivation of
any rights, privileges, or immunities secured by the Constitution and
laws, shall be liable to the party injured in an action at law . . .

42 U.S.C. § 1983.

[4] Under New York State Human Rights Law,

It shall be an unlawful discriminatory practice [f]or an employer or

disability discrimination claim against the City for violation of
New York City Administrative Code § 8-107(1)(a).[5]  Presently
before this Court is defendants' motion for summary judgment with
respect to the claims and defendants that remain.  For the
reasons set forth below, defendants' motion is granted in part
and denied in part.

## Background

The following facts are drawn from the submissions of the
parties in connection with this motion. Disputes are noted.

Plaintiff Chernoff commenced employment as a New York City
police officer in 1995.  For purposes of calculating his pension,
his starting date was recorded as February 9, 1995, taking into
account his prior service as a New York City Housing Police
Officer. Defendants' Exhibit ["Def. Exh."] 7.

Between 1997 and 2005, plaintiff worked in the

---

licensing agency, because of the age, race, creed, color, national
origin, sexual orientation, military status, sex, disability,
predisposing genetic characteristics, or marital status of any
individual, to refuse to hire or employ or to bar or to discharge from
employment such individual or to discriminate against such individual in
compensation or in terms, conditions or privileges of employment.

N.Y. Exec. Law § 296(1)(a).

[5] New York City Human Rights Law states in relevant part:

. . .any person claiming to be aggrieved by an unlawful discriminatory
practice as defined in chapter one of this title or by an act of
discriminatory harassment or violence as set forth in chapter six of
this title shall have a cause of action in any court of competent
jurisdiction for damages, including punitive damages, and for injunctive
relief and such other remedies as may be appropriate . . .

N.Y.C. Admin. Code § 8-107(1)(a).

Identification Service of the NYPD as a fingerprint examiner,
except for a six-month period in the Latent Print Section between
1999 and 2000. Chernoff Deposition ["Chernoff Dep."] at 40-43,
Plaintiff's Exhibit ["Pl. Exh."] D; Def. Exh. 8. Plaintiff
worked in addition as a security guard for other employers on his
days off. *Id.* at 78-82. The parties dispute the dates of his
work as a security guard. According to the defendants, plaintiff
worked as a security guard until late 2004 or 2005. Plaintiff
states that he stopped working as a security guard in November
2002, but later worked as a security guard sporadically for a
brief period of time in 2004. *Id.*

Plaintiff states, and defendants dispute, whether on
September 11, 2001, he was a "first responder" to the World Trade
Center attacks. Chernoff Affidavit ("Chernoff Aff.") ¶ 11.
According to defendants, plaintiff reported to One Police Plaza
that morning and remained there for the duration of his shift.
Chernoff Dep. at 96; Def. Reply Exh. 2. Thereafter, defendants
allege that plaintiff worked at One Police Plaza on September 12
and 13, 2001 and spent his free time walking around Ground Zero.
*Id*. at 93-94, 117-23. Plaintiff states, and defendants dispute,
whether plaintiff was assigned to Ground Zero approximately 27
times between December 2001 and May 2002. *Id*. at 125, 129;
Chernoff Aff. ¶ 31. According to defendants, plaintiff
volunteered to provide security around the perimeter of the site.

Chernoff Dep. at 125.

At some time in the fall of 2001, plaintiff began to feel the effects of his exposure to the September 11 disaster and, in November 2002, plaintiff voluntarily surrendered his weapons. *Id*. ¶ 87.

On December 26, 2002, plaintiff called the NYPD Early Intervention Unit expressing suicidal thoughts. He was taken to Columbia Presbyterian Hospital for psychiatric evaluation, hospitalization, and treatment. NYPD Psychological Evaluation Unit Note, Def. Exh. 9; Columbia Presbyterian Hospital Physician Admission Assessment, Def. Exh. 10. According to defendants, but disputed by plaintiff, plaintiff reported to the hospital that his feelings of suicide, depression and panic attacks were on account of the break-up of his marriage. *Id*.

In January 2003, after plaintiff was discharged from the hospital, the NYPD Psychological Evaluation Unit began to monitor plaintiff's mental health. February 11, 2004 Report of Dr. Catherine Lamstein ("Lamstein Report") at 1, Def. Exh. 19.

In January 2003, plaintiff was placed on restricted duty after allegedly threatening his estranged wife and her new boyfriend. NYPD Modified Assignment Report, Pl. Exh. F; Def. Exh. 11.

On March 7, 2003, plaintiff was suspended for thirty days after being arrested while off-duty for petit larceny and the

date of his appointment for pension purposes was changed to March 12, 1995 to reflect this suspension. NYPD Arrest and Suspension Report, Def. Exh. 12; Police Pension Fund Letter, Def. Exh. 13.

Shortly thereafter, plaintiff was admitted to Columbia Presbyterian Hospital because he was suicidal. Chernoff Aff. ¶ 48; Lamstein Report at 4.

On March 10, 2003, the NYPD issued charges and specifications against plaintiff on account of the March 7, 2003 arrest, which were served on plaintiff on April 7, 2003. March 7, 2003 Charges and Specifications, Def. Exh. 14.

In July 2003, plaintiff's then girlfriend alleged that he was involved in a domestic dispute with her. Internal Affairs Bureau Investigation Report, Def. Exh. 15.

On September 17, 2003, plaintiff was admitted to Columbia Presbyterian Hospital on account of suicidal ideation, due in part to plaintiff's learning that he was likely to be terminated on account of the criminal charge. Dr. Benjamin McCommon Treatment Notes, Def. Exh. 16; Pl. Exh. L.

Dr. Benjamin McCommon, a Columbia Presbyterian psychiatrist who treated plaintiff, diagnosed him as suffering from "Major Depressive Disorder, Alcohol Abuse [with] a concern for Substance Induced Mood Disorder." Letter from Dr. McCommon, Def. Exh. 17.

Plaintiff states that he also received a diagnosis of Post-Traumatic Stress Disorder ("PTSD") from a Catholic Charities

therapist. Chernoff Aff. ¶5; Letter from Dr. Rachel Yehuda, Pl. Exh. 4; Letter from Mary Gibbons, LCSW, Pl. Exh. J; Letter from Jack. L. Hilerman, Pl. Exh. K. Plaintiff claims that he began experiencing suicidal ideation and feelings of depression on account of his experiences at Ground Zero and that his PTSD is 9/11 service-related. Chernoff Aff. ¶¶ 13-14. According to plaintiff, he told Dr. McCommon, the NYPD doctor who failed to diagnose his PTSD, about his PTSD symptoms that developed shortly after 9/11. Chernoff Dep. at 267.

On December 12, 2003, the NYPD issued another set of charges and specifications, which were served on plaintiff on January 4, 2004. December 12, 2003 Charges and Specifications, Def. Exh. 18; Pl. Exh. G. According to defendants, the charges and specifications were issued in response to the threats in January 2003 against his estranged wife and the July 2003 incident involving his then girlfriend. *Id*.

On February 11, 2004, Dr. Catherine Lamstein, a NYPD psychiatrist who had been monitoring plaintiff since 2003, wrote a psychiatric evaluation stating that plaintiff's symptoms were chronic and likely to flare up again in the face of stress, and that she was concerned about suicidality. She concluded that the "likelihood of [plaintiff] being psychologically fit for full police work in the near future is very poor." Lamstein Report at 7. Plaintiff states that Dr. Lamstein refused to consider the

PTSD diagnosis reached by his Catholic Charities therapist, two other Catholic Charities doctors, and a therapist at an in-patient alcohol treatment program that he attended. Chernoff Aff. ¶¶ 50-54.

Following Dr. Lamstein's report, the NYPD Supervising Chief Surgeon recommended that plaintiff be examined by the Police Pension Fund Medical Board ("Medical Board") to determine whether plaintiff should be retired with ordinary disability benefits. Recommendation for Examination by Article II Medical Board, Def. Exh. 19.

Plaintiff was provided a notice of the recommendation on March 12, 2004. Notice, Def. Reply Exh. 1. The notice, which plaintiff signed in acknowledgment of receipt, states:

> If you believe that you are not disabled and can perform full police duties, and you do not wish to be retired, you have the right to the following procedures . . .

*Id.*

According to defendants, on May 24, 2004, plaintiff was examined by the Medical Board. May 24, 2004 Examination of Member of Service, Def. Exh. 20. Plaintiff states that Dr. Mendel of the Medical Board questioned him for less than ten minutes outside the room where the Medical Board was going to meet and determine the outcome of his application. Pl. Aff. ¶ 81. The Medical Board recommended approval of the application for retirement with ordinary disability benefits. May 24, 2004 Examination of Member of Service.

On June 4, 2004, plaintiff submitted an application to the Medical Board to be considered for accidental disability retirement, based on his 9/11 related PTSD.  Application for Accident Disability Retirement, dated June 4, 2004, Def. Exh. 21.

On June 15, 2004, plaintiff agreed to defer his disability pension application pending the outcome of the proceedings with respect to his disciplinary charges.  Agreement to Defer Pension Application, Def. Exh. 22.

On August 3, 2004, Plaintiff, who was represented by counsel, signed a negotiated settlement in which he agreed to plead guilty to the disciplinary charges.  According to defendants, by signing the agreement, plaintiff agreed to "forfeit all time, pay and benefits for the period while under suspension to wit: from March 7, 2003 to April 7, 2003 for a total of thirty-one (31) days," "waive all accrued time and leave balances," and "immediately rescind" the prior deferral of his disability retirement application so that it could be considered. Negotiated Settlement, Def. Exh. 23; Pl. Exh. N.  The dispositions of charges repeat the terms of the negotiated settlement.  Disposition of Charges, Def. Exh. 24; Pl. Exh. M. Plaintiff acknowledges that he signed the negotiated settlement but states that he was taking medication at the time and was not mentally or emotionally capable of understanding the terms of the agreement.  Pl. Aff. ¶ 58.

On October 25, 2004, the NYPD Commissioner approved the
negotiated settlement and the disposition of the disciplinary
charges to which plaintiff had pleaded guilty.  Negotiated
Settlement; Disposition of Charges.

On January 25, 2005, plaintiff presented himself at the
office of the Police Pension Fund for the processing of his
application for ordinary disability retirement benefits.  He
requested that his retirement date be March 30, 2005 instead of
January 12, 2005.  Retiree Data Sheet, Def. Exh. 2.  With a
retirement date of March 30, 2005, Plaintiff would have been in
service for ten years and would be entitled to a pension
equivalent to 50 percent of his adjusted salary, instead of 30
percent with less than ten years of service if his retirement
date was January 12, 2005.  Pl. Aff. ¶ 60. Plaintiff states, and
defendants dispute, that Dr. Lamstein and an unspecified
representative to the medical board told him that he could retire
with an effective date that would give him ten years of service.
Pl. Aff. ¶¶ 55, 61.  Plaintiff also states that he was entitled
to a March 30, 2005 retirement date because he did not
effectively waive his terminal leave balance when he signed the
negotiated settlement.

On February 1, 2005, plaintiff was directed to appear at the
NYPD Advocate's Office, which had determined that plaintiff had
failed to comply with the terms of the negotiated settlement by

attempting to extend his retirement date to March and that he would be retired as of January 12, 2005. Kathleen Kearns Deposition at 20-21, Def. Exh. 27.

According to plaintiff, when he met with Kathleen Kearns she told him that in accordance with the negotiated settlement his effective retirement date should be January 12, 2005 and that he would be terminated if he did not agree to that date. Pl. Aff. ¶ 64. Plaintiff also states that Kearns told him he did not have a right to seek advice from his new counsel prior to signing the form, *id.* ¶ 65, that he was held against his will and placed in a room with no windows guarded by officers, where he remained until 4 or 4:30pm, *id.* ¶ 67, and that he was patted down, made to empty his pockets to verify that he did not have any weapons, and was asked if he had ever attempted suicide. *Id.* ¶¶ 67, 69. Plaintiff claims that various people told him to sign the forms and threatened him with termination if he did not sign. *Id.* ¶ 74. At the end of the day, he was told that he did not need to sign anything, that he could go home, and that he was officially retired as of January 12, 2005. Pl. Aff. ¶ 66.

On April 4, 2005, the Medical Board denied plaintiff's application for service-related accidental disability retirement. April 4, 2005 Examination of Member of Service, Def. Exh. 29. According to defendants, the Medical Board reviewed the Columbia Presbyterian hospital records, Dr. Lamstein's February 2004

report, a letter from plaintiff's counsel, a March 5, 2005 letter from a Catholic Charities Mental Health Outpatient Services social worker diagnosing plaintiff with PTSD and Major Depressive Disorder, the symptoms of which are "9-11-01 related." *Id.*

On May 26, 2005, plaintiff brought an Article 78 proceeding in the Supreme Court of the State of New York, County of New York, claiming that his retirement date was illegally changed to January 12, 2005 and that he was illegally held by the NYPD Advocate's Office. Notice of Petition, Def. Exh. 30. He sought a change in his retirement date to March 30, 2005 but did not challenge the denial of his application for accidental disability retirement benefits. *Id.*

Thereafter, plaintiff filed a second application for accidental disability retirement, which was denied on November 14, 2005. November 14, 2005 Medical Board Decision, Def. Exh. 32. Defendants state that in reaching its decision, the Medical Board considered new evidence in the form of a Social Security Administration decision for a claim of disability filed by plaintiff and a meeting with him on November 14, 2005. *Id.*

On November 15, 2005, plaintiff stipulated to the discontinuance of the Article 78 proceeding with prejudice. Stipulation to Discontinue, Def. Exh. 31.

On December 7, 2005, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission

("EEOC").

On March 8, 2006, the Department of Justice issued a right to sue letter. Letter from Department of Justice, Def. Exh. 6; Pl. Exh. C.

On May 8, 2006, the Medical Board denied plaintiff's third application for accidental disability retirement. May 8, 2006 Medical Board Decision, Def. Exh. 33. According to defendants, the Medical Board considered new evidence consisting of a report submitted from the Catholic Charities Mental Health Clinic. The report noted that plaintiff was diagnosed with PTSD, depressive disorder, and alcohol dependence (in remission). The report stated that the clinic had been treating plaintiff since May 28, 2004 for "depressive symptoms" and was helping him to "develop coping strategies" for his symptoms. *Id.*

On June 9, 2006, plaintiff commenced this action.

## Discussion

*Summary Judgment Standard*

A court must grant a motion for summary judgment if the movant shows that "there is no genuine issue as to any material fact" and that "the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "An issue of fact is genuine if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Elec. Inspectors, Inc. v. Vill. of E. Hills*, 320 F.3d 110, 117 (2d Cir. 2003). A fact is material when it "might affect the outcome of the suit under the governing law." *Id*.

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a "metaphysical doubt" as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assocs. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). In deciding such a motion, the trial court must determine whether "after resolving all ambiguities and drawing all inferences in

favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

*Americans with Disabilities (ADA) Act Claim*[6]

In order to establish a prima facie case of disability discrimination, an employee must show that: (1) the employer is subject to ADA; (2) the employee suffers from disability within meaning of ADA; (3) the employee was otherwise qualified for his position; and (4) the employee suffered an adverse employment action because of his disability. *Cameron v. Community Aid for Retarded Children*, 335 F.3d 60, 63 (2d Cir. 2003)(citing *Giordano v. City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)). Once the plaintiff establishes a prima facie case, defendants must "offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse employment action] and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis North America Inc.*, 445 F.3d 161, 168 (2d Cir. 2006) (internal citation omitted).

---

[6] Defendants also seek the dismissal of plaintiff's ADA claim against the individual defendants. Defendant correctly argues that individual defendants may not be held liable, either in their individual or official capacities, for alleged violations of the ADA. *Connell v. City of New York*, 00-CV-6306, 2002 WL 22033, at *4 (S.D.N.Y. 2002); *Scaggs v. New York*, 06-CV-799, 2007 WL 1456221, at *15, n.12 (E.D.N.Y. 2007). However, while plaintiff's opposition papers treat the ADA claim as if he raised the claim against the individual defendants, plaintiff's amended complaint only raises the ADA claim against the City. Accordingly, I treat the ADA claim as against the City only.

Assuming, without deciding, that plaintiff has established a prima facie case of disability discrimination, no reasonable juror could find that the denial of plaintiff's service-related accidental disability pension applications was the result of discriminatory animus against plaintiff because of a 9-11 related PTSD disability.[7] Defendants state that the Medical Board reached their decisions based on their review of an internal medical report, Columbia Presbyterian Hospital records, documents submitted by plaintiff as well as their meetings with plaintiff. Defendants have offered a legitimate non-discriminatory reason for their denial of plaintiff's applications. Plaintiff's rebuttal consists of conclusory allegations that the Medical Board's proffered explanation is pretextual and two letters from mental health professionals that were not provided to the Medical

---

[7] In plaintiff's amended complaint, plaintiff alleges that the City discriminated against him in violation of the ADA in its "failure to treat plaintiff in a manner comparable to other similarly situated disabled individuals in the accidental disability pension retirement process[.]" Second Amended Complaint ¶ 70. In his opposition papers, plaintiff for the first time argues that defendants violated the ADA because he "was not given the opportunity . . .to continue his employment" and because "[h]e was deprived of the right to receive an ordinary disability pension based upon ten years of service." Plaintiff's Memorandum of Law, dated March 20, 2008, pp. 13-14. In papers later submitted at the direction of the Court, plaintiff argues that he was discriminated against in the denial of his accidental disability pension application. Plaintiff's Memorandum of Law, dated June 4, 2008, p. 2. Since plaintiff raised the removal from service and denial of his right to a retirement date reflecting ten years of service as ADA claims for the first time in his opposition papers, I do not consider them. *See Beckman v. United States Postal Serv.*, 79 F.Supp.2d 394, 407 (S.D.N.Y. 2000).

In any event, plaintiff's ADA claims stemming from his removal from service and the denial of pension based on ten years of service would be time-barred because they are actions that took place more than 300 days before the filing of plaintiff's EEOC charge on December 7, 2005. *See* 42 U.S.C. § 2000e-5(e)(1) (requiring plaintiff to file charge with EEOC within 300 days after allegedly unlawful practice occurred).

Board at the time of his applications.  *See* Pl. Exh. H; Pl. Exh.

K.  Plaintiff's conclusory statements regarding the motivation

for defendants' actions do not suffice to withstand a motion for

summary judgment.  *See Cameron*, 335 F.3d at 63 ("Purely

conclusory allegations of discrimination, absent any concrete

particulars, are insufficient")(internal quotation marks and

citation omitted).  Nor do the letters support an inference of

discriminatory animus on the part of defendants.  While the

letters may raise a factual issue as to plaintiff's diagnosis,

disagreement over a diagnosis is not sufficient to support the

inference that the Medical Board harbored animus towards

plaintiff on account of 9/11 related PTSD.  Construing all of the

facts and drawing all inferences in the light most favorable to

plaintiff, no reasonable juror could find that the Medical

Board's denial of plaintiff's accidental disability applications

was motivated by discriminatory animus towards plaintiff on

account of 9/11 related PTSD.  Accordingly, defendant's motion

for summary judgment on plaintiff's ADA disability discrimination

claim is granted.[8]

*Section 1983 Due Process Claim*

---

[8] Aside from the definition of a disability, the elements of a
disability discrimination claim under federal, state, and city law are the
same.  *See Parker v. Columbia Pictures,* 204 F.3d 326, 331 n.1 (2d Cir. 2000);
*Shannon v. New York City Transit Auth.,* 332 F.3d 95, 103-04 (2d Cir. 2003);
*see also Constance v. Pepsi Bottling Co. of NY*, No. 03-CV-5009, 2007 WL
2460688, at *33 (E.D.N.Y. 2007)(collecting cases).  Accordingly, summary
judgment is granted in favor of defendant with respect to plaintiff's state
and local disability discrimination claims.

"Section 1983 provides an instrument by which an individual deprived of a federal right by a person acting under color of state law may be compensated." *Eagleston v. Guido*, 41 F.3d 865, 875 (2d Cir. 1994)(citing *Parratt v. Taylor*, 451 U.S. 527, 535 (1981)). "It is well established that in order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States." *Id*. at 875-76 (quoting *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993)).[9] Generally "§ 1983 allows plaintiffs with federal or constitutional claims to sue in federal court without first exhausting state judicial or administrative remedies." *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 881 (2d Cir. 1996)(citations omitted).

Defendants argue that plaintiff's section 1983 due process claims must be dismissed because plaintiff had an adequate

---

[9] Plaintiff maintains that he is raising a disability discrimination claim pursuant to section 1983 and appears to argue that defendants intentionally discriminated against him. However, his amended complaint does not allege that his equal protection rights were violated. Rather, his amended complaint alleges that defendants deprived him of his "constitutional rights, including the rights: to enjoy freedom of speech, movement, association and assembly, to petition his government for redress of his grievances, to be secure in his person, to be free form unreasonable search and seizures, to enjoy privacy, to be free from deprivation of life, liberty, and property without due process of law." Second Amended Complaint ¶ 79. Since defendant's summary judgment motion focuses on plaintiff's due process claims, I only consider the due process claims.

postdeprivation remedy, in the form of a New York State Article
78 proceeding, which plaintiff failed to pursue.

1. Procedural Due Process

"[T]here *is no* [procedural due process] violation (and no
available § 1983 action) when there is an adequate state
postdeprivation procedure to remedy a random, arbitrary
deprivation of property . . ." *Hellenic*, 101 F.3d at 882
(emphasis in original)(citations omitted).  On the other hand,
"[w]hen [a] deprivation occurs in the more structured environment
of established state procedures, rather than random acts, the
availability of postdeprivation procedures will not, ipso facto,
satisfy due process."  *Id.* at 880 (citations omitted).

An Article 78 proceeding reviews "whether a determination
was made in violation of lawful procedure, was affected by an
error of law or was arbitrary and capricious or an abuse of
discretion." N.Y. C.P.L.R. § 7803(3).  An Article 78 proceeding
constitutes an adequate postdeprivation procedure to address
random, unauthorized acts.  *Hellenic*, 101 F.3d at 881.  In an
Article 78 proceeding, the Medical Board's determination "will be
sustained unless it lacks rational basis, or is arbitrary or
capricious."  *Matter of Borenstein v. New York City Employees
Ret. Sys.*, 88 N.Y.2d 756, 760 (1996).

To the extent that plaintiff claims his procedural due
process rights were violated on account of random, unauthorized

acts on the part of defendants, an Article 78 proceeding provided the proper course of action and plaintiff's procedural due process claims fail as a matter of law.  However, defendants have not addressed whether they acted pursuant to established state procedures for determining plaintiff's disability pension eligibility, an issue on which plaintiff is not required to exhaust state remedies prior to filing a section 1983 action.[10] Accordingly, plaintiff's procedural due process claim cannot be dismissed as a matter of law.

2. Substantive Due Process

"Substantive due process protects against government action that is arbitrary, conscience shocking, or oppressive in a constitutional sense, but not against a government action that is incorrect or ill-advised."  *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)(internal quotation marks and citation omitted).  Substantive due process "'does not provide a remedy to a public employee that would not be available to a private employee subject to identical conduct by his employer.'"  *Chaffer v. Bd. of Educ. of the City School Dist. of City of Long Beach,* 229 F.Supp.2d 185, 190 (E.D.N.Y. 2002)(quoting *McClary v. O'Hare*, 786 F.2d 83, 89 (2d Cir. 1986)).

Here, plaintiff claims that the defendants violated his

---

[10] I therefore do not address the facts underlying the processing of plaintiff's claim because defendants have failed to discuss them in their moving papers.

substantive due process rights when they classified him as disabled, rejected his disability accident pension applications, and refused his request for a particular retirement date.

Viewing the facts in the light most favorable to plaintiff and drawing all inferences in his favor, no reasonable juror could find that defendants' decisions were arbitrary or abusive. Although plaintiff may disagree with the Medical Board's determinations, incorrect actions do not rise to the level of constitutional violations. *See Kaluczky*, 57 F.3d at 211. Plaintiff's claim regarding the date of retirement also fails because he has demonstrated nothing more than a disagreement with the terms of the negotiated settlement, and "a mere 'contract dispute . . . does not give rise to a cause of action under Section 1983.'" *Chaffer*, 229 F.Supp.2d at 190 (quoting *Costello v. Town of Fairfield*, 811 F.2d 782, 784 (2d Cir. 1987)). Accordingly, defendants' motion for summary judgment on plaintiff's substantive due process claims is granted.[11]

---

[11] In addition to the section 1983 due process claim, Counts IX and X of the amended complaint allege violations of plaintiff's due process rights under the Fifth Amendment of the United States Constitution. Although defendants have not moved for summary judgment on the lack of viable Fifth Amendment claims, because a motion for summary judgment permits the Court to search the record and to grant summary judgment to the party entitled thereto, *see Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991), I review the viability of plaintiff's Fifth Amendment claims. The Fifth Amendment protects an individual's due process rights with respect to the federal government's conduct. Plaintiff has not filed claims against any federal government actors. Accordingly, the Court dismisses plaintiff's Fifth Amendment claims. *See Taylor v. Lawrence, No.* 05-CV-1316, 2008 WL 2357066, at *3 (N.D.N.Y. 2008).

## Conclusion

For the reasons set forth above, defendants' motion for summary judgment is granted in part and denied in part. The Clerk is directed to transmit a copy of the within to the parties and the Magistrate Judge.

SO ORDERED.

Dated:    Brooklyn, NY
          September 10, 2008


By: /s/ Charles P. Sifton (electronically signed)
    United States District Judge